# CASES

## ARGUED AND DETERMINED

### ·IN THE

# SUPREME COURT OF ILLINOIS.

ARTHUR T. VAUGHN *et al.* Appellants, *vs.* MANFORD
VAUGHN, Appellee.

*Opinion filed February 16, 1916.*

1. DEEDS—*rule as to presumption of delivery in case of a voluntary settlement.* In the case of a voluntary settlement the law indulges stronger presumptions in favor of delivery of the deed than in the case of an ordinary bargain and sale.

2. SAME—*courts of equity are strongly inclined to uphold deeds of voluntary settlement.* Courts of equity are strongly inclined to uphold deeds of voluntary settlement to persons having claims upon the grantor's bounty, and attach more importance to the intention of the grantor, as disclosed by the whole evidence, than to the mere manual possession of the deed.

3. SAME—*when equity will regard deed as delivered.* A court of equity will regard a deed of voluntary settlement to the grantor's son as delivered where the evidence shows that the grantor put the grantee in possession of the land about the time the deed was executed; that the grantee remained in such possession, paid the taxes and made valuable improvements; that the grantor a few days before his death directed his prospective administrator to hand the grantee the deed, which was then in the grantor's safety deposit box in an envelope marked with the grantee's name, and that the administrator, after the grantor's death, handed the deed to the grantee, who placed it on record.

4. SAME—*when equity will require grantee to fulfill his obligation.* Where the grantor, in making a voluntary settlement on one

of his sons, requests him to pay a certain sum to a daughter of the grantor in order to equalize their respective advances, a court of equity, in holding that the deed was delivered notwithstanding manual possession did not pass until after the grantor's death, will require the grantee to keep his obligation to make the payment.

APPEAL from the Circuit Court of Henderson county; the Hon. HARRY M. WAGGONER, Judge, presiding.

SCOFIELD, HELFRICH & CALIFF, for appellants.

APOLLOS W. O'HARRA, RUFUS F. ROBINSON, JOHN D. MILLER, and JOHN W. WILLIAMS, for appellee.

Mr. JUSTICE CRAIG delivered the opinion of the court:

Appellants, Arthur T. Vaughn, George Vaughn and Hannah C. Dixon, being three of the nine children and heirs-at-law of Matthew Vaughn, deceased, on April 7, 1906, filed their bill in chancery in the circuit court of Henderson county, Illinois, making the widow and other children of said Matthew Vaughn defendants, among them Manford Vaughn, appellee, seeking to partition 320 acres of land described as the south half of section 35, township 9, north, range 6, west of the fourth principal meridian, in said county. The amended original bill, by which Hannah C. Dixon is made defendant instead of complainant, alleges the death of Matthew Vaughn, intestate, his ownership of the land in question, and, after setting forth the facts as to heirship, alleges that Manford Vaughn falsely and fraudulently claimed that his father, about July 1, 1901, made him a deed for said premises; that while Matthew Vaughn and Rhoda Vaughn, his wife, the step-mother of Matthew Vaughn's children, did sign and acknowledge a deed for the said premises to Manford Vaughn this deed was never delivered, and that Manford Vaughn, at the time of his father's death, in 1905, was the owner of no other or greater part of the land than his share as an heir of his father. A decree *pro confesso* as to the

amended original bill was rendered against all defendants except Manford Vaughn, who answered, admitting the allegations of the bill as to heirship but denying that Matthew Vaughn was the owner of the land in question at the time of his death; alleging that prior to the time of his death Matthew Vaughn and his wife had executed and delivered to him, said Manford Vaughn, a deed for the said premises, and alleging that upon the execution of such deed, he, Manford Vaughn, was put in possession of the said premises as owner and has had possession thereof ever since, acquiesced therein by Matthew Vaughn as long as he lived, and that with the knowledge of his father he had made valuable improvements on the said premises at his own expense. The answer further alleges that he, Manford Vaughn, filed the deed for record in the office of the recorder of deeds of Henderson county; that Matthew Vaughn gave him the said land and put him in possession thereof as owner, and that at the time of the said gift Matthew Vaughn requested him, the said Manford Vaughn, to pay to his sister, Hannah C. Dixon, a daughter of the said Matthew Vaughn, the sum of $3000 as a gift or advancement to her from the said Matthew Vaughn, and that he, Manford Vaughn, tendered the money to Mrs. Dixon and that she refused to receive the money from him; that afterwards he paid the money to Matthew Vaughn upon request of the latter, after he had informed him of Mrs. Dixon's refusal. Manford Vaughn also filed a cross-bill, in which he alleged that his father made gifts of land and personal property to each of his other eight children in amounts ranging from $7000 to $10,000; that he, Manford Vaughn, was married in June, 1901, and that thereupon Matthew Vaughn gave him the land in question, and promised and agreed with him to convey to him the land if he would accept the same and take possession thereof and move upon and improve the land; that he then and there accepted the land; that Matthew Vaughn and his wife moved from the premises to Burling-

ton, Iowa, and that cross-complainant and his wife moved into the residence on the premises and took possession of the said land and lived thereon and cultivated the premises and made valuable improvements thereon in reliance upon and under and in pursuance of the said alleged agreement and promise by the said Matthew Vaughn to convey the premises to cross-complainant. The cross-bill further alleges the making of valuable improvements on the premises relying on the said alleged promise and agreement, and the making of a deed by Matthew Vaughn and Rhoda Vaughn, his wife, for said land to him, Manford Vaughn, in pursuance of the said alleged promise and agreement, and alleges that the said deed, after the death of Matthew Vaughn, was filed for record by Manford Vaughn in the recorder's office of Henderson county. It is alleged further in the cross-bill that even if the deed to the land was never properly delivered, Manford Vaughn is in equity the owner of the land and entitled to a conveyance thereof from the other children and heirs-at-law of Matthew Vaughn because of his agreement concerning the land and the acceptance and compliance with the terms by the cross-complainant, and it is prayed in the cross-bill that the defendants may be decreed to specifically perform the said alleged agreement and to convey to him the said premises.

The complainants in the original bill and Hannah C. Dixon answered the cross-bill, denying the allegations thereof. All other defendants were defaulted. Those answering set up the Statute of Frauds, alleging that the alleged contract was not in writing, and that there was no memorandum or note thereof in writing signed by Matthew Vaughn or by any other person thereunto by him lawfully authorized in writing, and alleging that said alleged agreement is void and of no effect under and by virtue of the statute in relation to frauds and perjuries. The matters at issue under the amended original bill and the answer of Manford Vaughn are the delivery of the deed and the parol

gift of the land. Hannah C. Dixon filed a cross-bill asking that Manford Vaughn be required to pay the $3000 in the event that the court found that he was entitled to the premises, under his agreement with Matthew Vaughn to pay her said amount as a condition to the gift of the farm. The issue under the cross-bill of Manford Vaughn and the answers is whether or not Manford Vaughn is entitled, under the alleged parol contract, to the conveyance of the land in question to him by the other heirs-at-law of Matthew Vaughn.

The cause was heard at the October term, 1911, and taken under advisement by the court. Afterwards Hannah C. Dixon died, and leave was given to file a supplemental bill showing her death, intestate, leaving no child or children or descendants thereof, but leaving surviving her Thomas Dixon, her husband, and her sisters and brothers, parties to the suit, as her sole heirs-at-law. The supplemental bill also sets forth the change in the fractional interests of the parties by reason of the death of Mrs. Dixon and makes Thomas Dixon, her surviving husband, a party. A supplemental cross-bill was also filed by Manford Vaughn, who also filed an answer to the supplemental bill, and the other parties answered the cross-bill, but there was no change in the main issues in the suit. Thomas Dixon in his answer to the cross-bill of Manford Vaughn alleges that Matthew Vaughn retained the deed to the land in his possession with the intent and purpose of not delivering the same to Manford Vaughn until he paid Hannah C. Dixon, or Matthew Vaughn for her, the sum of $3000, and such payment was a condition to the conveyance of the premises which Manford Vaughn never performed, and that if Manford Vaughn should be permitted to retain possession of the said pretended deed and the record thereof should be allowed to stand or a decree should be made requiring the other heirs of Matthew Vaughn to convey the said premises to him, then, as the equitable condition to

such a decree and upon the maxim that he who seeks equity should do equity, Manford Vaughn should be required by such decree to pay him, Thomas Dixon, the sum of $3000 with interest thereon or such part thereof as remains unpaid with interest thereon, and that a lien should be impressed upon the said premises for such amount in his favor as a condition to the granting of any affirmative relief to Manford Vaughn under the said original cross-bill and supplemental cross-bill. The death of Mrs. Dixon was suggested to the court, and on motion her cross-bill was abated by order of the court, no one being substituted as complainant therein nor any bill of revivor being filed. Replications to all the answers were duly filed and further evidence was heard as to the death of Mrs. Dixon and as to her heirs and the other new matters alleged in the supplemental bill and cross-bill. The issues raised by the cross-bill of Mrs. Dixon were before the court on the hearing in December, 1911, and the testimony of Manford Vaughn was offered by his counsel upon the issues raised by these allegations of Mrs. Dixon's cross-bill and was admitted by the court for that purpose. It is insisted by counsel for appellants that the testimony of Manford Vaughn in support of his answer to Mrs. Dixon's cross-bill should not be considered, the same having been abated.

After hearing evidence on the issues made by the supplemental bill and answers and the supplemental cross-bill and answers thereto the chancellor rendered a decree in favor of the cross-complainant, Manford Vaughn, dismissing the original bill and supplemental bill for want of equity and finding substantially the facts as alleged in the answer and cross-bill of the said cross-complainant. Among other things, the court found and decreed that Matthew Vaughn, joined by Rhoda Vaughn, in attempted compliance with his promise and agreement with his said son Manford Vaughn to give him said land, on or about July 1, 1901, made the deed described and referred to in the amended original bill

and cross-bill, and that Matthew Vaughn gave directions that said deed should be delivered to Manford Vaughn, but the court found that said deed was not delivered to him in the lifetime of Matthew Vaughn in such a manner as to vest title in Manford Vaughn by or through the deed itself, by its own force and effect; that said deed was executed by Matthew Vaughn and his said wife for the purpose of carrying out his said promise and agreement with Manford Vaughn by making conveyance of the property aforesaid, and such deed and its execution by Matthew Vaughn and his said wife were considered by the court in connection with the other statements and declarations by Matthew Vaughn and the other evidence in the case upon the question of the settlement and gift made by him in favor of Manford Vaughn with respect to said premises; that Matthew Vaughn made a voluntary settlement upon Manford Vaughn, and thereby gave him the premises in controversy as his own property and estate in fee simple, and that he retained no title or right in himself in or to said premises and that he owned no interest therein at the time of his death, and that upon his death his widow and heirs (except Manford Vaughn, who was the owner,) took no right or title thereto of any character, and that Manford Vaughn, from about July, 1901, has been in equity the owner of said premises, and that none of the other parties to this suit have any right or title or interest therein, and that Manford Vaughn is entitled, under his cross-bill and his supplemental cross-bill, to have their supposed rights or claims canceled and held for naught as clouds on his title thereto.   It was further decreed by the court that the defendants to the cross-bill be required to execute and deliver, either jointly or severally, their deed or deeds to Manford Vaughn, conveying to him their apparent interest or title in and to the premises within thirty days of the entry of the decree, and in event of their failure so to do, then, upon request, the master in chancery of said court should make ·

272 – 2

a deed or deeds as on the part and behalf of said persons, conveying their apparent interest or title to the premises in controversy to Manford Vaughn. It was further decreed that the deed of Matthew Vaughn and Rhoda Vaughn dated July 1, 1901, be permitted to remain of record, and that each and all of the heirs-at-law, their legal representatives or assigns, as well as the widow of Matthew Vaughn, be forever estopped and enjoined from disputing or denying the right or title of Manford Vaughn in and to the said premises.

The complainants in the original bill and defendants to the cross-bill have appealed from the decree, and assign as error the dismissal of the amended original bill and supplemental bill and the granting of the relief prayed in the cross-bill and in the supplemental cross-bill, and that the decree of the circuit court is contrary to the law and evidence. Thomas Dixon also assigns as error the action of the court in not requiring Manford Vaughn to pay him the amount claimed by Mrs. Dixon, he being her sole heir-at-law as to personal property of her estate.

As to the facts, it sufficiently appears from the evidence that Matthew Vaughn in his lifetime had made gifts of land and other property to all of his nine children by a former wife except Manford Vaughn, who was the youngest. Rhoda Vaughn, widow of Matthew Vaughn and stepmother of appellee and his brothers and sisters, was called as a witness for complainants. She testified that she and her husband executed a deed July 1, 1901, conveying to Manford the farm in controversy and that he about that time went into possession. When they made the deed it was the understanding that Manford was to have the land described in the deed. Manford and his wife moved onto the house on the farm and she and Matthew Vaughn moved to Burlington, Iowa. When the deed was made out it was understood that Manford was to have it. It was placed in a safety deposit vault in a bank in Burlington, and she,

Rhoda Vaughn, could get it any time she wanted it. Matthew Vaughn also put in the safety deposit box a deed which he had made to said Rhoda Vaughn for eighty acres of land, and a deed to George Vaughn, another son, for some timber land. He put the deeds in an envelope, and he asked witness if she desired her deed put in also, and she replied in the affirmative. Her name was written on the envelope, and her husband put that deed and the other deeds in his box in the safety deposit vault in the bank. She had access to the box. Her husband wished Manford's deed to be handed to him, if it was not already handed to him, at his death; that she could either hand it to him or put it on record, as she saw fit. Her husband said the farm belonged to Mannie. Manford was called Mannie by members of the family. She also testified that Manford paid $1000 on this land to his father to be given to Mrs. Dixon, for the reason that Mrs. Dixon would not receive it from him, and that Mrs. Dixon received the $1000; that this $1000 was paid in October before her husband's death; that he died in February, 1905. The vice-president of the National Bank of Burlington testified that Matthew Vaughn had a box in the safety deposit part of the bank and had control of the box.

James Vaughn, a brother of complainants and Manford and a party to the suit, was called by complainants and testified that he was one of the administrators of his father's estate and found the deed in his father's safety deposit box in the bank in Burlington. On cross-examination he testified that a day or two before his father died he told witness that Mannie's deed was in the bank and directed witness to give it to him, and also to give Rhoda, his wife, her deed, which was also in the bank; that he found the deed to Manford in an envelope in his father's safety deposit box in the bank, marked in the handwriting of his father, "Mannie Vaughn deed," and that he handed the deed to Manford in accordance with his father's instructions. Arthur

T. Vaughn, one of the complainants in the original bill, was present at this conversation.

A question to Arthur T. Vaughn asking what statements his father made concerning his property and what he wanted done was objected to. The objection was sustained, and counsel for the complainants offered to prove by the witness that a night or two before the death of Matthew Vaughn he said to the witness and James Vaughn that he wanted James to administer on the estate and that he wanted the property equally divided; that James said, "What about Mannie?" and his father answered, "There is a deed for him when the proper time comes." An objection was sustained to this offer. James Vaughn and Rhoda Vaughn were testifying against their own interests.

J. A. C. Johnson, a brother-in-law of appellee, testified that Matthew Vaughn told him, about July, 1901, that he had not given Mannie a deed to the farm, and he was not going to get a deed until he paid Kittie (Mrs. Dixon) $3000. This testimony was objected to, and even if admissible the conversation occurred before the deed was acknowledged, which was several months after the date it bore and may have occurred before the deed was executed. This witness also testified that Manford told him that his father had given him the farm in question as his share of the estate provided he paid Mrs. Dixon $3000, but he did not believe she would ever ask him for it, as she and her husband had more money than they could spend, anyway.

This was practically all of the evidence on behalf of complainants as to the circumstances surrounding the making of the deed by Matthew Vaughn after making a gift to the farm in question to Manford Vaughn. On the other hand, it was shown by a number of witnesses apparently disinterested and not related to the parties, that in July, 1901, Manford was married and brought his wife to the farm in question, and that shortly afterwards his father removed therefrom to Burlington, Iowa, and resided there

until his death, February 12, 1905; that he told a number of persons at different times that he had given the farm to Manford and considered him as in full possession and ownership thereof. G. F. W. Froelich, who had known Matthew Vaughn for many years and who had been county clerk, deputy circuit clerk and held other county offices, on the request of Vaughn drew the deed dated July 1, 1901, in the office of the circuit clerk at Oquawka, the county seat of Henderson county. The deed was signed and several months afterwards acknowledged by Vaughn and his wife in Burlington, Iowa. On a subsequent occasion Vaughn informed Froelich, who was then acting as tax collector, that Manford was to pay the taxes on said land, and that he, Manford, was the owner. It also appears that in addition to paying taxes, Manford, after he went into possession of the land, repaired the buildings, erected a tenement house, etc., and made other valuable improvements.

We have considered the evidence in the record carefully, and from the evidence there can be no doubt that it was the intention of Matthew Vaughn to give the land in question to the appellee, Manford Vaughn, and there can be little doubt that he thought he had done everything that was necessary to transfer the title. He and his wife executed this deed and acknowledged it. About that time he placed Manford in full possession and control and thereafter recognized him as the owner. He had made similar gifts to each of his other children and prior to that time had given nothing to Manford. He kept the deed in a safety deposit box in a bank. The land is situated in the south part of Henderson county, near the village of Carmen. Vaughn went to Oquawka, the county seat, and had Froelich write the deed in the office of the circuit clerk. His wife was not there. The deed was acknowledged several months later, in Burlington, Iowa, to which city they had removed. The deed was deposited, along with a deed to his wife and other papers, in the safety deposit box, as it

would seem for safe keeping, merely, and not for the purpose of retaining possession or withholding delivery from the grantee named in the deed. If the grantor retained possession of the deed after it was made and acknowledged with any idea of withholding the farm or not making a complete gift thereof to Manford such fact does not appear from the evidence, but, on the contrary, all the evidence indicates that he intended to make a complete gift of the farm to Manford and thought he had done so. According to the testimony of Rhoda Vaughn, his widow, and James Vaughn, his son, who both testified against their own interests and whose testimony is not contradicted, he gave directions that the deed be given to Manford, and this, under the circumstances of the case, would be a sufficient delivery. The directions given by Matthew Vaughn, as testified to by his son James, are in entire keeping with his conduct and actions from the time that he first put Manford in possession of the place and removed therefrom and executed the deed to the land. Pursuant to these directions James Vaughn, who was one of the administrators of his father's estate, delivered the deed in question to Manford, who filed the same for record.

In the case of *Elliott* v. *Murray*, 225 Ill. 107, in passing upon the question of delivery, the court says (p. 112) : "The question of delivery is a mixed question of law and fact, and it is held that the delivery of a deed may be made by acts alone,—that is, by doing something and saying nothing; or by words alone,—that is, by saying something and doing nothing; or it may be delivered by both acts and words. It must, however, be delivered by something answering to the one or the other, or both, and with the intent thereby to give effect to the deed." In case of voluntary settlement the law makes stronger presumptions in favor of the delivery of a deed than in an ordinary case of bargain and sale. As said in *Creighton* v. *Roe*, 218 Ill. 619, on page 622 of the opinion : "Such settlements, fairly

made, are binding on the grantor unless there be clear and decisive proof that he never parted or intended to part with the possession of the deed, and if he retained it the weight of authority is decidedly in favor of its validity, unless there are other circumstances, besides the mere fact of his retaining it, to show that it was not intended to be absolute." In Devlin on Deeds, (secs. 260-262,) quoted with approval in *Prince* v. *Prince*, 258 Ill. 304, the rule as to the necessity of a manual delivery of a deed is stated, as follows: "The act of delivery is not necessarily a transfer of the possession of the instrument to the grantee and an acceptance by him, but it is the act of the grantor, indicated either by acts or words, or both, which shows an intention on his part to perfect the transaction by a surrender of the instrument to the grantee or to some third person for his use and benefit. The whole object of a delivery is to indicate an intent upon the part of the grantor to give effect to the instrument. It is not necessary to pursue any particular course to effect a valid delivery of a deed. It is sufficient that a grantor intends, when executing a deed, to be understood as delivering it." In *Hoyt* v. *Northup*, 256 Ill. 604, on page 608 of the opinion, it is said: "Intention is the controlling element which determines whether a deed has been delivered, and the question must depend in great measure upon the peculiar circumstances of each case. It is not essential to a valid delivery that there should be a manual transfer from the grantor to the grantee, and, on the other hand, such a manual transfer may not amount to a delivery. * * * In the case of a voluntary conveyance the retention of the deed in possession of the grantor will not destroy its effect as a deed unless there are other circumstances to show that it was not intended to be absolute and to operate as a present conveyance.—*Baker* v. *Hall*, 214 Ill. 364."

In the *Hoyt case, supra,* the grantor executed a deed conveying property to his housekeeper and gave it to the

notary for safe keeping, and it remained in his custody until the death of the grantor, without any directions, apparently, by the grantor as to the delivery of the deed. After the grantor's death a petition was filed by his executor in the county court seeking to sell the land described in the deed, and other land, to pay debts of the deceased. The petition charged that the deed was not delivered in the lifetime of the grantor and was void. The decree of the county court set aside the deed and directed the executor to sell the premises, and on appeal to this court the decree of the county court was reversed and the case remanded, with directions that the petition should be dismissed as to the land conveyed by the deed. On page 609 of the opinion the court says, referring to the deed made by decedent to his housekeeper: "If it is regarded as a voluntary conveyance by the grantor to his housekeeper there is strong presumption in favor of delivery, which would not be overcome by the mere fact, if it be a fact, that the grantor kept the deed in his possession until his death."

Courts of equity are strongly inclined to uphold deeds of voluntary settlement to persons having natural claims upon the grantor's bounty, and will do so unless impelled to the opposite conclusion by strong and convincing evidence. Such courts do not attach such importance to the mere manual possession of the deed as they do to the intention of the grantor, as gathered from the whole evidence, in regard to the vesting of the title. If the intention of the grantor to pass the title presently to the grantee is satisfactorily made out by the proofs courts of equity have usually sustained such transfers, even in cases where the manual possession of the deed remained with the grantor. *White* v. *Willard,* 232 Ill. 464, and cases cited.

In the case of *Rodemeier* v. *Brown,* 169 Ill. 348, the facts were very similar to those in the case at bar. In that case Frank Brown, Sr., the owner of the land, went to a notary public and stated that he wanted to give his son

Frank the farm on which he lived, said son to pay the grantor $300 a year as long as he and his wife lived. The notary wrote a deed to the farm making the son grantee, containing the provision as to payment of $300 a year to the grantor and his wife, and it was signed and acknowledged and the grantor took the deed with him. Soon after he left the farm and removed to the village of Lena, where he lived until his death, leaving the farm in the possession of the grantee in the deed, who remained in possession up to the time of his father's death, about ten years later, paying all the taxes and making valuable improvements and during that time paying $300 a year to his father. A few days before his death the father called one of his sons to him and told him that Frank's deed was in a certain drawer and to take it and give it to him, and the son replied he would do so. The court held with reference to the delivery that evidence that a grantor about to die pointed towards a deed and asked a person standing by to take it and deliver it to the grantee, which request was then assented to but not carried out until after the grantor's death, shows a good delivery, where the grantee had been in the possession of the land, cultivated it for years with the knowledge of the deed, had paid all the taxes, made valuable improvements and conformed to all of the terms of the deed; and the fact that the father executed the deed to his son and permitted him to take possession of the land, pay all taxes, make improvements and pay a stipulated sum each year as part of the consideration from the time the deed was made until the grantor's death, will constitute an equitable estoppel against a contention by the heirs that there was no delivery of the deed. To the same effect are *Winterbottom* v. *Patterson,* 152 Ill. 334, *Crabtree* v. *Crabtree,* 159 id. 342, *Reed* v. *Douthit,* 62 id. 348, *Miller* v. *Meers,* 155 id. 284, *Henry* v. *Henry,* 215 id. 205, *Thompson* v. *Calhoun,* 216 id. 161, and *Riegel* v. *Riegel,* 243 id. 626.

In the last case just cited, in stating what amounts to a delivery of a deed, the court says: "It may be by acts without words or words without acts, or both. Anything which clearly manifests the intention of the grantor that the deed shall presently become operative and effectual, that the grantor loses all control over it and that the grantee is to become possessed of the estate, constitutes a sufficient delivery. In the case of a deed which is a voluntary settlement the law presumes much more in favor of a delivery than it does in ordinary cases of deeds of bargain and sale, and this presumption is especially strong when the grantee is an infant. As to such a deed the presumption is in favor of delivery, and the burden of proof is on one claiming adversely to show that there was no delivery. (*Bryan* v. *Wash,* 2 Gilm. 557.) The law has regard to the relationship of the parties and the motives that are presumed to induce the making of such a deed, and casts the burden upon the grantor, or those who claim under him, to show that there was no delivery. (*Chapin* v. *Nott,* 203 Ill. 341.) A deed made as a voluntary settlement may be effective to vest title in the grantee although it is retained by the grantor in his possession until his death, if other circumstances do not show an intention contrary to that expressed on the face of the deed. The grantor may deliver the deed either to the grantee or to a stranger for his use, and an acceptance by the grantee will be presumed from the fact that the deed is for his benefit, especially if the grantee is an infant. The test in all cases is the intent with which the act or acts relied upon as equivalent or a substitute for actual delivery were done, and in determining the question whether a deed of voluntary settlement has been delivered, the grantor's intention to vest title in the grantee is regarded as of more importance than the mere manual possession of the deed.—*Rivard* v. *Walker,* 39 Ill. 413; *Cline* v. *Jones,* 111 id. 563; *Miller* v. *Meers,* 155 id. 284; *Baker* v. *Hall,*

214 id. 364; *Henry* v. *Henry,* 215 id. 205; *White* v. *Willard,* 232 id. 464."

Taking into consideration all the facts and circumstances as shown by the evidence in the case at bar, we think it is clear that Matthew Vaughn fully intended to make a complete gift of the land in controversy to his son Manford, the appellee, and made the deed of conveyance for the purpose of carrying out such intention. It is clear that Manford accepted such gift and went into possession of the land, and from that time on had full possession and exercised exclusive ownership and dominion over the same. While it is true that the grantor retained possession of the deed, there is no evidence but that he intended to give the full and complete ownership and title to the farm to Manford as what he considered to be Manford's share of his · estate, and the evidence showing that before he died he directed that the deed be delivered to him, and pursuant to such directions it was so delivered to and recorded by the grantee, this, under the circumstances of this case, was a sufficient delivery.

In the decree of the circuit court which was appealed from, the holdings that Manford Vaughn was in equity the owner of the land and denying the prayer of the original bill that the deed be canceled, and that the deed in question be permitted to remain of record and the other heirs-at-law of Matthew Vaughn be estopped from disputing Manford's right or title to the premises in question, were, we think, correct.

The able and exhaustive argument of counsel for appellants is directed principally against the findings of the court below under the allegations of the cross-bill, but all of these questions must necessarily be considered together, and were so considered by the learned chancellor in the court below and by this court, and it is difficult to separate them in the decision of the case. As to the sum of $3000 claimed by Thomas Dixon, it appears, and appellee concedes,

that he agreed to pay that amount to Hannah C. Dixon, daughter of Matthew Vaughn, and it appears from the evidence that the purpose of requiring this payment was to equalize the gifts that Vaughn had made to his children. It does not clearly appear that appellee's payment of such amount was a condition attached to the gift of the farm or that any time was set for such payment; but even so, the strongest point in favor of sustaining the gift and deed to appellee is the fact that the gift was in the nature of a voluntary settlement made by a parent to a child who had a natural claim upon the grantor's bounty, and in making such gift the grantor was only doing by the donee the same as he had done by his other children. The father also requested that appellee pay Mrs. Dixon a sum which would make her equal in the general distribution made to all the children. Whether the payment of such sum was a condition to the complete vesting of the gift to appellee or not, the same reasons that are urged and appeal most strongly in favor of sustaining the gift to appellee appeal with equal force to requiring appellee to make good his obligation to Mrs. Dixon. Appellee claims to have offered to pay her, in her lifetime, the sum provided but she refused to take it from him, and that accordingly he paid it to Matthew Vaughn for her. It appears from the testimony of Rhoda Vaughn that he did pay at least $1000 to Matthew Vaughn for Mrs. Dixon and that Matthew paid this over to her. Checks from appellee to Matthew that had been paid and canceled were offered in evidence for various amounts, aggregating $2470.60, but it is not shown what any of these checks were for, except the last two, to which the evidence of Rhoda Vaughn seems to refer and which were drawn on different banks and were dated August 10, 1904. They were for $400 and $600, respectively. The last check, being for $600, is marked, "Payment on place in full." The court made no finding in the decree as to whether appellee had paid all of the $3000 or not, but apparently considered

that issue between the parties was eliminated from consideration when the cross-bill of Mrs. Dixon was by order of the court abated after her death. We think that the question as to whether Mrs. Dixon was entitled to be paid this $3000, and whether or not it had been paid, was properly put in issue by the supplemental cross-bill of appellee and the answer thereto of Thomas Dixon.

It is assigned as error on behalf of Thomas Dixon that the court did not require the sum of $3000 to be paid him. It appears that Hannah C. Dixon left no children or descendants of children; that Thomas Dixon, her surviving husband, was her sole heir as to her personal property, and that he had paid all of her debts that might be claims against her estate and that there was no necessity of any administration. The question remains, was this $3000 ever paid? Appellee claims it had been paid, and Mrs. Dixon in her lifetime, and her husband after her death, claimed it had not been paid. We think the proof is sufficient that $1000 of this amount had been paid, and it further appears that appellee shortly after his father's death met Mrs. Dixon in the village of Carmen and offered to pay her $2000. He subsequently claimed that he did this simply to avoid a lawsuit and by way of compromise, but, in any event, this offer was sufficient to stop the running of interest, which was also claimed. If she had accepted his offer at that time that issue would have been eliminated from the case. We think, as a matter of equity, that appellee should pay this $2000, and that the decree of the circuit court in other respects should be affirmed.

Accordingly the decree of the circuit court will be reversed and the cause remanded to the circuit court of Henderson county, with directions to enter a decree consistent with the views herein expressed. Each party will pay his own costs in this court.

*Reversed and remanded, with directions.*